Case No. 25-1653 Jamal Ward v. Charles Brotzke 4 arguments not to exceed 15 minutes per side Mr. Kamenik, you may proceed for the appellant Good afternoon. Welcome to Detroit. Thank you. May it please the court, my name is Rob Kamenik. I represent the plaintiff appellant here. I think I've reserved three minutes for rebuttal and I will tell you that I'm here arguing for my predecessor attorney who left the law firm. That being said, the primary issue in this case as the court knows is whether or not by way of immunity it was reasonable to use deadly force under the circumstances of this case. I've looked at this a few times and went back and forth on exactly how to argue this case because I understand that I have certain challenges here and there's no doubt that at some point in time my client had a gun and he had a gun in his hand. When I assumed this case I also understood that under the third gram factor my trial attorney and perhaps rightfully so had already admitted there was a resisting arrest and fleeing both and that's of record. I know the court knows that but with that challenge I think the issue here is did the officers fire to avoid imminent harm and I think that really I looked at the file, I looked at all the cases, where is there any indication that my client intended to use the weapon? So from Brodsky's perspective, I think that's how you pronounce his name, he hears gun, he knows that the guy is resisting in the sense that the guy does not give the gun. The first officer on the video when you watch, he walks up, he asks him if he has a permit, he says he doesn't, the officer basically asks him to hand over the gun, he could hand over the gun, the whole encounter is over. But instead he resists, he starts running, shots are fired and then Brodsky encounters him. At that point he's heard shots, he's heard he has a gun and he's running at it. How can that not be enough under all of our case law for him to discharge his weapon? I don't, I take issue with your last point your honor if I may, I don't think he's running at him. Well Brodsky was in the door right? He was, if I may by way of configuration, the plaintiff was running, I'll call it north so to speak and Brodsky was here on the east in an aisle way. He was more at an angle though, I mean I watched the video, I thought he was more at an angle. So I could see from Brodsky's perspective that he thought he was running, he was kind of in the aisle way, he saw him running down the aisle at least in one angle from the video. I mean whether he's running at him, he's running, he's going to be running pretty close by him. I'm not, I'm not suggesting necessarily that this is a very material fact. I'm just trying to get the record as clear as I can. Okay, how about he's running in his direction? He's running out the door without a doubt. With a weapon. Well and that's, there's a little bit of an issue there. Well it's what a reasonable officer would believe and the record is undisputed that he had a gun, that the officer said he had a gun, and that there were shots fired by the point he gets, he's running towards Brodsky. Shots fired by Officer Thompson, yes. But I mean you're going to, do you think Brodsky knew who fired the shots? No, but Brodsky claims that he could see the gun in the right hand and then at the same time denies that he could see whether or not the gun was dropped. But that's because it happened so fast. I think both are true. There's no doubt it happened very quickly. I'm, I cannot contest that. And I do know, and I again, I'm an officer of the court. I do know that there was expert testimony presented by the city and by the officers more precisely. And when I went through my trial file, I didn't see any competing expert report on the timing issue. So again, I'm, I have to be candid with the court in that regard. And the best I have for you is that I do not believe that there is any indication, and you may disagree with this, and I understand that, but there was no indicia, no indication that my client intended to use the gun. He never pointed the gun. It was down at his side as best we can tell from the video. One of the officers testified, I think it was Thompson, testified only that he, quote, perceived that the gun was being aimed at him, which at best would create a question of fact. And, and going back to the first point that we just had the discussion on, I don't think there's any question that my client was just getting out of there. He was bolting towards the exit. Now, had he earlier had a tussle with one of the officers, no doubt. I can't, I can't. But do officers have to wait for a tussle with someone with a gun in their hand who's running? It's not like the cases you pointed to where it's there, this, he's running towards an officer and shots have been fired. In that officer's perspective. In that officer's perspective, well, we're talking about what would be objectively reasonable, objective officer. I understand that. That's the test. And again, I did look at the video and I think it was clear that Officer Brodsky, when he heard the commotion, and again, I can only kind of, it's really hard to put together the diagram from the videos. I really worked hard on this. I know opposing counsel did too. But you see that, for lack of a better way to put it, the tussle's going on here and the client, my client is running out here. Brodsky goes around this end, if I may. And then he crouches down here to see if he can catch my client at a right angle. And he does, I admit, he does tend to step out, so to speak at one point in time, into the aisle. And that's where the shooting takes place. And from everything I can tell, those are the bullets that actually hit my client. At bottom, aren't you saying that, so your client could have shot, it would have only taken all of two seconds, probably, for your client to get a shot off. So, I mean, under your rule, we would be suggesting that law enforcement officers just have to take the risk that someone who may be fleeing, and someone who might use violence to flee, won't shoot them. And that seems, that's a pretty high risk for the Fourth Amendment. It's worse than that because he's already declined to cooperate. Yeah, so it would have taken, your client could have shot at Brodsky in all of one or two seconds. And under your rule, I think you would agree that, under your rule, that he would, he just has to take that risk? My rule is, unless the gun is actually pointed at someone, or it's wrapped, or there's some indicia that it's going to be used, that you can't really reach the conclusion. Why isn't the indicia of him taking it out of, taking it out of his pants and running with it in his hand, a suggestion that it might be used? Because we know that, well, actually what happened, he threw away the gun. But, again, you know what happened, but the officers there are acting in a split second. They are. And so you're asking, again, I think it's worse than Judge Murphy described, because I think the first officer approaches him in the corner of the store, you can see it clearly in the video, and he asks him, and then he asks him if he has a permit, and he could simply comply. I mean, what we're, like if we say, this is the way I'm just envisioning, you should tell me why I'm wrong, if we say, it's clearly established in this situation, officer approaches, does nothing wrong, says, is that a gun, do you have a permit, he says no, and then asks for the gun or whatever, and he doesn't comply, and then he starts resisting and pulls the gun out. For whatever reason, the officers already know he has a gun, if he was simply going to throw it away in the officer's mind in that split second, why wouldn't he have just handed it to him, or thrown it right there and then ran out, but instead he chose to pull it out and run with it towards the door, going out, he's in a closed environment, he's going out into the public with a gun, and what you're saying is, the officer has to put his own life at risk, and that of the public at that point, for someone who's noncompliant and running towards, in his general direction, with a gun, out. Understood, I understand your point, I understand the challenge here, my argument is straightforward, and whether it's acceptable or not, I understand that, and that is, unless there's something more, to use the case law language, unless there's something more, such as aiming the gun, what if they don't know, now I'm making this up, just to be clear, so it's a hypothetical, what if they don't know where he's aiming the gun, because he's running with it in his hand, they can't shoot him? They don't, if they don't know, they can shoot him with deadly force, if he's going to try other steps, but not with deadly force. So he's declined to cooperate, he's running away from one officer, the officer's heard he got fired, right, and that's all undisputed, and now he doesn't know if he's pointing the gun at him, or he's just running and the gun's coming up as he's running, and he can't... He is waiting for him, that's my only other thing I would add to your scenario, and your honors, again, I started this off saying I know this is challenged, I brought it up that I've been here before, and I've been around the block, and I understand the challenges I have, and I wish I had a better set of... I'm just trying to figure out, and I appreciate your predicament, and I appreciate your argument, and the thoughtfulness with it, I'm trying to figure out where the line is in what we tell officers in a situation like this, does that make sense? In other words, if the test is are they aiming it at you, or aiming it at anyone is what I think you're saying. How do we know in a fast-paced encounter like this? The best I have on that is if the gun is being... I know in some ways you're going to tell me this is an oxymoron, but I'm going to say it anyways. If the gun is being used in a threatening manner. That should be the test, in other words. If the person doesn't have to comply, you can hear shots being fired, but the only question for the officer, even if... Assume he fired the shots at the first officer. Just assume that for the sake of argument. I'm sorry, I misunderstood. Assume...  Yeah, we know your client didn't, but I'm saying assume he did. Assume he pulls out the gun and fires at the first officer and runs. The other officer doesn't see it. Same exact scenario for the other officer. He doesn't know who's fired the shots. He hears the shots being fired, he hears gun, and the guy's running. You're saying unless the gun is pointed at him in a threatening manner, he cannot fire. Unless there is knowledge that the gun is being used in a threatening... In your scenario, the knowledge would be the gunshots. And suppose that my client would discharge the gun and that would be an indication... But the officer doesn't know, right? Brodsky doesn't know who discharged the firearm at that point. I understand. Okay. I understand. So unless, again, this is a challenging case, I'm... Well, I appreciate you being honest about it and your thoughtful argument. Any further questions? You'll have your full rebuttal time. Thank you. Thank you, Your Honors. Good afternoon. May it please the court, my name is Linda Fagans, and I proudly represent these two police officers for the city of Detroit. I can tell by your questions that you're very aware of the facts. You asked the question, what do you tell your police officers here? First of all, Graham says that you can't judge your actions under hindsight, and I think you're very, very aware of it. And the question is, and what is... And it's been asked by plaintiffs, just because he has a gun, that's insufficient. Does mere possession of a gun make him... That he should be shot? This is not a case of a mere possession of a gun. But couldn't Brodsky have just tripped him? I mean, he was running by, he could have stuck his leg out and tripped him. Excuse me, Your Honor, would you repeat that question again? Yeah, I'm sorry, I'm rubbing my eye. Couldn't Brodsky have just tripped him as he ran out? He was running by him, he could have used less deadly force to stop him. Your Honor, Brodsky, and that is a precarious situation, but you have to understand the position we're looking at from the perspective of the reasonable officer would do here. He was in a situation where he heard Officer Romshack shout, he has it, he has a gun. He heard two shots fired. He could not attribute where the shots were from. Did Ward shoot the gun, or was one shot, he hears two, or one shot from the officer? He had positioned himself near the exit. So when he comes, he sees Ward come running around that corner directly at him. This is a rapidly evolving situation. Split second decision here. And you've heard that he has, he's already resisted. He's already running down the hall with a gun in his hand, and he's heard these shots. He doesn't, at this split second time, he hears him running, and he sees him running. Someone is saying, stop. Thompson is saying, I'm going to shoot you, bro. Does he stop? No. And let me tell you something. These police officers have experienced situations like this where persons take out that gun and running, they plan to use it. So that's part of their experience and perception here. Do you think there's any difference between Thompson and Brodsky? So Brodsky, I could see the argument that Ward was running in his general direction, but Thompson started firing when Ward was running away. So query whether Thompson's shots may be deemed excessive even if Brodsky's were not. Okay, with Thompson, not to be glib, Thompson's shots did not hit him. And technically our first argument for Thompson is he never, there was no seizure of Ward. And if there's no seizure, there's no fourth-minute violation. And those cases we rely on in our briefing, you know, was Adams and Cameron. In that case, the police officers get out in this high chase, and they shoot at him. What? Does the particular defendant stop running? He never stopped running. He never was hit. And so the courts ruled in both of those Sixth Circuit cases that there was no seizure, so you can't have a fourth-minute violation. But then, even if you want to say that, you don't mind, that there was no seizure here, I think that the actions of Thompson were reasonable in here. He's already, he's seen more than anybody. He's heard what his fellow officer is saying, he's got a gun. He knows that he has resisted. See, and this is everything, even those who might say, oh, he was just in the corner with, lighting up a bud, and so forth. But he had a gun, which is a violation, without a permit here. He sees him running. But we've said gun possession alone is not enough. I beg your pardon? But we've always said gun possession alone is not enough. You certainly have, and you're right. It's not enough. But under Campbell v. Cheatham, it talks about that. It talks about the different indicias that do make it enough. And in this case, all those indicias do. This is a rapidly developing situation. He's already resisted. He's run. He comes with a gun. He does, disobeys the commands of the police officers to stop. He keeps on running, and he never, they never see him, and that's the issue that arises, drop the gun. Now what we find out, and it's in the record, that when Brodsky begins to shoot, that Ward did drop his gun about like a hundred seconds at the same time he did. A hundred seconds. Not minutes. No time to think. So in this particular issue, even the expert in here says that was no time for him to assess that he had dropped the gun at that particular time. You have to look at the case of Muggins v. Sarnak, which Plaintiff relies upon. In that particular case, they did not deny qualified immunity. In that case, the police officer was wrestling with the young man, and he saw that the man had a gun. He told him to drop it, drop it, drop it. The young man took the gun and dropped it, and yet the police officer, unfortunately, shot him anyway. This court determined that he was still entitled to the qualified immunity because it happened so fast and rapidly that he had kept resisting, and then he, when he threw it out at the same time, he had shot him. He had no time to assess him. It says, the indicia is, did these officers have, did Brodsky, did Thompson have probable cause to believe that their lives were in danger? Not only their lives, the fellow officers, but there were patrons, civilians in the store as well. This is a close, confined, small area where other people could have been hurt here. Did he run with the gun? Did he have any risks? All these other factors add up to make it objectively reasonable under Campbell v. Cheatham, which plaintiff cites, even under Mullins, in this particular case, even though it sounds harsh, to believe that, yes, this was enough. No, I agree. Mere possession is not, but he did more, and when he would not kept running, holding that gun, you don't know whether he had his finger on the trigger or not. And so, what happens here, these officers reasonably, there was probable cause to believe that they had to shoot to stop him in this particular case, Your Honor. And so, and then these seconds that he threw the gun away, and PC in the record said it was like less than a thousand seconds. It wasn't, again, it wasn't a time. So, he was, the officers were faced with a rapidly situation, a rapid arising situation. They had no time to be thinking. In hindsight, we got to be careful about sitting here in this courtroom making decisions under those type of situations in terms of the police officers who's involved in this. And Graham, which you know is a seminal case from the Supreme Court, says we should be very careful. And the case law like Thompson versus City of Columbus said that the police officer, the issue is, oh, should he have waited? Should he have tripped him? The case law says the police officer does not have to wait to see the butt of a gun in your face to shoot. Now, that's what's been, that has what's been said. Thompson versus City of Columbus makes it clear the officers need not face the business, they said the business end of a gun to use deadly force. And the expert in this case, Steve Ashley, expert, he filed some documents and he talked about the human cognition considerations, the time between perception and action when these police officers are making these decisions. So in this particular case, even though plaintiff argues that Bronstein, who said Bronstein really couldn't see, that makes it more in his favor in the fact that he heard shots. He saw some man running. He doesn't know who fired, but he sees a man coming at him with a gun. And so in this particular case, what if there's a dispute about whether the gun was thrown away before he shot him? Okay. What if there's a dispute about whether the gun was thrown away before he shot him? Shouldn't we let that go to trial then? No. Why not? Because as I said in the expert determined that it was just like in the case I just told you about Mullen. The officer told him to put the gun down, throw the way they were struggling. The particular defendant did throw the gun over his head. The officer, I guess he was so involved, didn't see it and at the same time he shot him. You all... But what about Campbell? Campbell says he has to be in a shooting posture. He was running away. Campbell doesn't necessarily say shoot. He gets a lot of indicia of that. And as far, Your Honor, I think it's reason to believe if I was to run down here with this gun towards you and hold it, whether I was really shooting here, in your mind, I have some type of posture because I've got the ability to shoot. I have the ability to put, you don't really know, my hand in there. Now you might wait, but hopefully this gentleman here will tackle me before then. He would. But, Your Honor, so in this particular case here, as I said before, they don't have to wait for the butt of a gun. Not in this rapidly evolving situation where you have it. And so while he wasn't like this, I'm going to shoot you, and he never said that, he never threatened, he never put that gun down where they could see it. And that is a quick... But we think that, you know, qualified immunity gives police officers the benefit of mistaken judgment under this particular case. And so, and we can't substitute our perspective about how this could have happened when we talk about the dangerous world in which police officers are involved in this particular case. Eddie, go ahead. Brodsky was outside the convenience store? He had been outside, but he came in, and he stepped in, because, you know, why they were there in the first place was because there's been a number of incidents at that gas station, either robberies or incidents. And then he heard, then he was stepped inside long enough to hear, and when his quick reflection is to hear what was going on, hearing the shots, but not knowing who shot, knowing someone kept a gun, and then what happened? He sees him coming down the aisle towards him with that. That's enough, Your Honor. But did he shoot as he was coming towards him, or after he had passed him? You mean he, Brodsky, right? Brodsky, did he shoot after the suspect had passed him? No, I think he shot as he was coming toward him. I think it was, and the record is not really clear. All I know is that the expert said, or that it happened about, and I can't find it in my notes right now, that it was about a thousand seconds he shot him just as Ward was dropping the gun. When you say a thousand seconds, you mean a thousandth of a second? A thousandth of a second, right, correct, Your Honor, yes. Anything further? Thank you very much, Counsel. So I would ask you that you would affirm this situation and grant these officers qualified immunity. Thank you. It might have been wiser to waive rebuttal, but I'm not going to do it, so. I'm sorry? It might have been wiser to waive rebuttal, but I'm not going to do it, so. Can you talk a little bit about the lack of a seizure by Thompson? Do you agree that if, well, number one, do you concede that Thompson's two shots did not hit your client? I don't concede it. The statement made on the record is I think that that's probably what happened.  But setting aside that concession, do you assume that he did not shoot your client? Would you agree that that's not a seizure? No, it is a seizure. Even if he misses? Under L.R., I think that's a seizure. Maybe I've got the case right in front of me, Jacobs versus Allen. I think, if I may, Your Honor, 9-15-Fed-3rd, it's in the briefs, 10-28-Fed-3rd, and the fact is, in that particular case where the shots were fired and they did not hit, they still considered it a seizure, the Sixth Circuit did. That answers your question. Well, what's the logic of that? It doesn't seem like a seizure to me. So set aside precedent. I can only read what this court said. Do you have a plain language view of whether a non-contact is actually a seizure? When the bullet does not hit the person, the show of authority has the intended effect of contributing to the person's immediate restraint. I'm quoting this court. Do you think that case survives Torres? I'm not sure if it does or not. I'm not that familiar with Torres. The Supreme Court decision in Torres? I understand. Yeah, okay. The principal reason why I stood up, sort of in the line of fire, if I can use that phrase here, is your question about Officer Thompson, because I think it was a good one. I think at the end of the day, we had that statement by the officer before the fireworks start, before a gun is pulled, at least the way I look at it. I said, I'm going to shoot you, bro. And that's a problem. And then when things start happening, and let's just assume my client does have the gun and turns the corner, where Thompson has no personal threat of harm, Romsleb obviously doesn't, and according to my theory, Brodsky's still off. He's not in the line of fire. He still takes two shots at him. So, you know, I thought that... I mean, assuming Torres says that a seizure occurs when he shoots someone, then you need evidence that Torres actually shot him, right? Assuming all the other evidence, viewing it in the light and less favorable to the plaintiff, I agree with you. And you've got a case, but assume Torres says what I say it says, what do you do in that situation? Then I've got a challenge on my hands. It's the best way I can put it. Is there any evidence in the record that any of the shots Torres fired actually hit your client? Yeah. Thompson. Thompson, I'm sorry. It's unclear, simply because of where... And I know my time's running. Can I answer your question? Yes, please. Okay. My client was hit in the right shoulder, the back of the right shoulder. I believe the back of both legs. I'm pretty sure of that. I think that's in the record. And the question is, when you see the video, and again, I'm sorry to keep acting, so to speak, when you see the way Brodsky's shooting, the question is whether he really could get to that angle to put those bullets on my client's body, as opposed to, again, if I may, and I know I'm here, Thompson had more of a direct line. It's the best answer I can give you. Okay. All right. Thank you very much, counsel. Thank you both for your arguments. The case will be submitted, and I think the rest of the cases are on the briefs, so we're in recess.